## STATE *v.* CHARLES C. STEWART AND OTHERS.*

*Criminal Law. Conspiracy. Employer. Workman. Boycott. Pleading.* R. L. ss. 4226, 4227.

1. The labor and skill of the workman, the plant of the manufacturer, and the equipment of the farmer, are in equal sense property; every man has the right to employ his talents, industry and capital as he pleases, free from the dictation of others; and if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy, whether the means employed are actual violence or a species of intimidation that works upon the mind.

2. PLEADING. CONSPIRACY. A count is sufficient which charges that the respondents unlawfully combined, conspired and agreed together to prevent and hinder by violence, threats and intimidation the Ryegate Granite Works from retaining and taking into its employ certain workmen.

3. A count is sufficient which charges that the respondents, with the malicious intent to control and injure said company, unlawfully conspired to terrify, intimidate and drive away by threats its workmen.

4. A count is sufficient which merely charges a conspiracy to do an unlawful act; and *a fortiori* one that charges a conspiracy to do an *unlawful* act by *unlawful* means; thus, the statute prescribes the punishment for using threats or intimidation to prevent a person accepting or continuing an employment in a mill, etc. The count charged that the respondents conspired with intent to prevent a prosecution of the business of said granite works and threatened its workmen that they were "scab shops," that the employees were "scabs," that their names would be published in the "scab" list in the Granite Cutters' Journal, that they would be shunned and disgraced in the craft, etc.; and that thereby they were frightened and driven away; *Held,* to charge a conspiracy to do an act unlawful at common law, by means unlawful under the statute; and that an offense is sufficiently set out under the statute, R. L. s. 4226.

5. It was unnecessary to aver that the respondents had knowledge of the wrongful character of the matters charged against them.

* Heard, May Term, 1886, at which term Powers, J., attended.

State *v.* Stewart.

6. DIFFERENT FELONIES. JOINDER. Felonies and misdemeanors, or different felonies, may be joined in the same indictment, if the counts cover the same transaction.

7. MOTION TO QUASH. A motion to quash is addressed to the discretion of the court, and its refusal is not revisable.

8. BOYCOTT. The boycott is not the remedy to adjust the differences between capital and labor.

9. The common law of England is the common law of Vermont in respect to conspiracies against employers and workmen.

INDICTMENT for a conspiracy to hinder and prevent the Ryegate Granite Works, a corporation doing business at Ryegate, from employing certain granite cutters, and for hindering and deterring certain laborers from working for the said corporation. Heard, June Term, 1885, Ross, J., presiding, upon the respondents' demurrer and motion to quash the indictment. The demurrer was overruled *pro forma*, and the motion to quash denied; to which the respondents excepted.

Indictment: "Be.it remembered, that at the County Court begun and holden at St. Johnsbury, the grand jurors, etc., present that James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, all of Ryegate, in the county of Caledonia, with divers evil disposed persons, to the said grand jurors unknown, on the 13th day of April, A. D. 1885, at Ryegate, in the county of Caledonia, did unlawfully combine, conspire, confederate and agree together to prevent, hinder and deter by violence, threats and intimidation, the Ryegate Granite Works, a corporation then and there being and existing by law, from retaining and taking into its employment James O'Rourke, William Goodfellow and other persons, to the said grand jurors unknown, then and there being as laborers in the labor and occupation of granite cutting to the great damage of the said Ryegate Granite Works, and the said James O'Rourke and William Goodfellow and other persons, to the said grand jurors unknown, then and there being as laborers in the labor and occupation of granite cutting to the great damage of the said Ryegate Granite Works, and the said James O'Rourke and William Goodfellow and others and to the evil example of all men and against the peace and dignity of the State.

And the grand jurors aforesaid upon their oath aforesaid further present that the said James D. Grant, Charles C.

Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, all of Ryegate, in the county of Caledonia, with other evil disposed persons, to the said grand jurors unknown, at Ryegate aforesaid, on the 13th day of April, A. D. 1885, maliciously intending to control, injure, terrify and impoverish the Ryegate Granite Works, a corporation then and there being and existing by law, and by violence, threats and intimidation, to force and compel said corporation to conform to the rules, regulations, by-laws and decrees of a branch of the National Stone Cutter's Union, an organization then and there existing, and to deprive said corporation of all the workmen and laborers then and there by it employed in its works and shops there situate, unlawfully did conspire, combine, confederate and agree to terrify, frighten, alarm, intimidate and drive away by threats and intimidation, James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others, to the said grand jurors unknown, who were then and there workmen and laborers of the said Ryegate Granite Works, to the evil example of all men and against the peace and dignity of the State.

And the grand jurors aforesaid upon their oath aforesaid further present that the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, being granite cutters by occupation and not being content to allow other granite cutters to pursue their avocation and employment wherever they wished and upon whatever terms might be agreed upon between said other granite cutters and their employers, but contriving and unjustly intending to destroy the effect of free competition in the price and value of labor, to coerce and constrain said other granite cutters and their employers and to compel said other granite cutters to desist from labor and to deprive the employers thereof of all their laborers and apprentices and thereby to ruin and destroy their business, did, on the 13th day of April, A. D. 1885, at Ryegate aforesaid, with force and arms combine, conspire, confederate and unlawfully agree together and did enter into an organization and compact whereby it was, among other things, provided that none of the parties to said compact and organization should labor or cut granite for any person or persons or corporation whose shop or works had been by the parties to said compact and organization disapproved of and adjudged to be "scab shops" or works, and

that no other granite cutters should be allowed to work or cut granite for or in such "scab shops" or works, and that all other granite cutters in this country should be notified that the shops or works so adjudged to be "scab" were "scab" and that work therein by granite cutters was forbidden by said organization and that all granite cutters who disregarded said prohibition and worked or cut granite in such "scab" shop or works should be called "scabs" and their names should be published as "scabs" in a certain newspaper called the Granite Cutters' Journal, a newspaper of wide circulation among granite cutters in this country, and that all granite cutters in this country should thereby be notified not to associate or work in the same shop with any of the parties so published as "scabs." And the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, in pursuance of the said unlawful conspiracy, combination and compact with the intent to prevent the prosecution of work in the shops and works of said Ryegate Granite Works next hereinafter mentioned, did then and there threaten and say to James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others who were then and there laborers, workmen and apprentices as granite cutters in the shops and works there situate of the Ryegate Granite Works, a corporation then and there being and existing by law and there carrying on the business of cutting granite and manufacturing granite work, that said shops and works of the said Ryegate Granite Works were "scab" shops and "scab" works and that no granite cutters were allowed to work therein and that the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others would be "scabs" if they worked in said last named shops or works and that their names would be published as "scabs" in said Granite Cutters' Journal if they worked in said last named shops or works and that they would be disgraced in the eyes of all granite cutters and would be avoided and shunned by all granite cutters, and that all other granite cutters would refuse to work or associate with them, if they worked in said last named shops or works, and were published as "scabs" as aforesaid; and by means of the said sayings and threats, the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill did then and there affright, drive away and prevent the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow

and others from accepting, undertaking and prosecuting their said employment in said shops and works of the said Ryegate Granite Works, with the intent of them, the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill last aforesaid.

And so the said grand jurors say on their oath aforesaid that the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill did then and there in manner aforesaid, by threats, intimidation and the unlawful and grivous conspiracy aforesaid, carried into execution as aforesaid, affright, drive away and prevent the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others from accepting, undertaking and prosecuting the employment and work of stone cutting in said shops and works of said Ryegate Granite Works, with the lawful intent of them, the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, thereby to prevent the prosecution of work in said Ryegate Granite Works, said shops and works, contrary to the form and effect of the statute in such case made and provided, and against the peace and dignity of the State.

And the said grand jurors, upon their oath aforesaid, further present that said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, all of Ryegate aforesaid, with the unlawful intent and purpose to prevent the prosecution of work which was then and there carried on by the Ryegate Granite Works, a corporation then and there existing under the laws of the State of Vermont, in the manufactory of the Ryegate Granite Works aforesaid, then and there situate, did then and there threaten the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others, to the said grand jurors unknown, who were then and there at work in said manufactory, that they, the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others, would be "scabs" and be called and advertised as "scabs" and that they, the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, would cause the names of the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others to be published in the "scab" list in the Granite Cutters' Journal, a paper of wide and extended circulation among granite cutters in the United States, if they, the said James O'Rourke, Hugh J.

O'Rourke, William Goodfellow and others, continued work in the said manufactory, and the said term "scab" as so threatened to be used by said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, is an opprobrious and disgraceful epithet, the use of which, in the manner threatened by the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, would have the effect to disgrace the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others, and make it difficult and impossible for them to get employment in their said employment of cutting stone in places where work of that character was wanted; and the effect of using the said term "scab" in the manner threatened, was well known both to the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill, and also to the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others, if they, the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others continued work in said manufactory; and by said threats then and there made, they, the said James D. Grant, Charles C. Stewart, Orrin E. Clay, John McGeough, Edward O'Toole and Lewis Hill did then and there, at Ryegate, aforesaid, unlawfully affright, drive away and prevent the said James O'Rourke, Hugh J. O'Rourke, William Goodfellow and others from prosecuting said employment in said manufactory.

Contrary to the form and effect," etc.

*Bates & May*, for the respondents.

In case the conspiracy is to do a lawful act by unlawful means, the means must be fully set out in the several counts. *State* v. *Keach*, 40 Vt. 113; 31 Me. 396; 43 N. H. 83.

In the third and fourth counts the preamble, the introductory and concluding matter, are mere recitals and cannot aid imperfect averments in the body of the complaint. *Commonwealth* v. *Hunt*, 4 Met. 111, 128; *Commonwealth* v. *Dean*, 110 Mass. 64.

The indictment is defective in not averring that the respondents, at time of alleged conspiracy knew that the workmen named, or some of them, were in the prosecution of work of

the granite company, or that they were about accepting, etc., work. *State* v. *Carpenter*, 54 Vt. 551.

A person is not liable for enticing and harboring the servant of another unless it is alleged and shown he knew of such relationship. 1 Bl. Com. 429 ; Wood Mast. & Serv. 256 ; Bailey's *Onus Probandi*, 207.

The English indictments under the modern statutes make knowledge a material allegation. *Reg.* v. *Bunn*, 12 Cox, C. C. ; s. c. 4 Moak's Eng. Rep. 564 ; Bishop Forms, s. 303 ; *Reg.* v. *Shepherd*, 11 Cox, C. C. 325.

The counts do not state that the workmen driven away by defendants *were under any contract* to perform labor for granite company, nor that defendants knew of said contracts. *Walker* v. *Cronin*, 107 Mass. 555, fully illustrates our claim. *See* Wood Mast. & Serv. s. 238 ; *Butterfield* v. *Ashley*, 2 Gray, 254 ; *Butterfield* v. *Ashley*, 6 Cush. 249 ; *Commonwealth* v. *Hunt*, *supra*. There is no allegation that the acts were wilfully and maliciously done by prisoners. *Walker* v. *Cronin*, 107 Mass. 555.

The statute has no application to acts like those set up in third and fourth counts. It had its origin in the violent and unlawful acts of the Troy & Boston R. R. Co. in reference to the branch running to Bennington village.

We assert that the whole act indicates that the legislature had in mind actual violence, or fear of bodily harm, whereby persons then employed in prosecution of labor, etc., might be affrighted or driven away from same. Two persons need not join in the act or purpose. It reads : "Alone, or in combination with other." A conspiracy required two or more to join, etc.

If any offense existed at the common law, the statute is now exclusive, The Act of 1867 enlarged the penalty for this sort of conspiracy and covers the ground. *State* v. *Stokes*, 54 Vt. 179.

If we are correct in this position, then the first and second counts cannot stand. Bish. Stat. Cr. s. 174.

State v. Stewart.

Did any such offense exist at the common law as adopted in this State? Certain English statutes were passed between the 13th and 19th centuries by Parliament in reference to "Combination of Workmen." These covered all combinations for purposes named at close of our first point.

We can hardly understand how such laws could ever have found their way into the books; they never could in a nation of free-born men and women. They were relics of feudalism and barbarism. A summary of these acts may be found in Roscoe's Cr. Ev. (7th Am. ed.) p. 425, et seq.

These acts show that both servant and master were alike amenable to the law. The limit of punishment was three months, and that, too, in case of use of actual violence to any person or property. Vide Trades Unions; Library Un. Knowl. vol. 14, p. 510; Wood Mast. & Serv. sec. 241; Mill's Political Economy, B. 2, ch. 13; "Danger Ahead," by Dr. Lyman Abbott,—Century, Nov. 1885, p. 51. The parliamentary legislation was not all adopted in Vermont. Le Barron v. Le Barron, 35 Vt. 367. We did not adopt the statutes in force April 19, 1775, as did New York in her constitution. Rev. Laws, 689. Judge STORY says in Levy v. M'Cartee, 6 Pet. 110: "The common law is constantly and generally used in contradiction to statute law."

The whole subject of criminal conspiracy by workmen, and whether it was an offense known at the common law is fully discussed in a recent English work. Wright on Law of Criminal Conspiracies, pp. 43–62; 2 Bish. Cr. Law, s. 231, note 2; Roscoe Cr. Ev. pp. 423, 454.

In New Jersey a well considered case declares that an indictment will not lie for conspiracy to commit a civil injury. State v. Rickey, 1 Halst. 293; See 28 Am. Dec. 511; 1 Cush. 189. The leading cases of this country are those of Master, etc. Asso. v. Walsh, 2 Daly, 1; Commonwealth v. Hunt, 4 Met. 111.

If the acts charged in the several counts are different, then the motion to quash must prevail. The first two counts set up

a misdemeanor; the last a felony. A felony and a different misdemeanor cannot be joined in an indictment. 1 Bish. Cr. Pro. ss. 189, 197; *Commonwealth* v. *McLaughlin*, 12 Cush. 612; *Grandon* v. *State*, 4 Hump. 25; 1 Bish. Cr. Laws, ss. 814, 790; *Johnson* v. *State*, 5 Dutcher, 453; Arch. New Cr. Proc. 93; *Kane* v. *People*, 8 Wend. 203.

*M. Montgomery, State's Attorney, H. C. Ide* and *Alex. Dunnett*, for the State.

The motion to quash was properly overruled for several reasons. If it be conceded that the first two counts attempt to set forth a misdemeanor, and the two last a felony, they are still properly joined as different descriptions of the same substantive offense. Thus counts for larceny, which is a felony, and conspiracy to cheat, which is a misdemeanor at common law, are properly joined. *Henwood* v. *Commonwealth*, 52 Pa. St. 424; *State* v. *Hood*, 51 Me. 363; *Cowley* v. *State*, 37 Ala. 152. So larceny and the receiving of stolen goods, the latter being a common law misdemeanor, are properly joined. *Harmon* v. *Commonwealth*, 12 Serj. & R. 69; *Steven* v. *State*, 11 Ga. 225; *Dawdy* v. *Commonwealth*, 9 Grat. (Va.) 727; *State* v. *Hazard*, 2 R. I. 474; *Keefer* v. *State*, 4 Ind. 246; *U. S.* v. *Prior*, 5 Chranch C. C. 37; *State* v. *Posey*, 7 Rich. 484; *Buck* v. *State*, 2 Harr. & John. 426; *State* v. *Sutton*, 4 Gill, 495.

All the counts are for the same acts by the same parties, at the same time, and are but different modes of stating the offense so as to meet the exigencies of the evidence. Lord CAMPBELL in *Reg.* v. *Ferguson*, 29 L. R. Eq. 536; *Commonwealth* v. *McLaughlin*, 12 Cush. 612; *State* v. *Lincoln*, 49 N. H. 464; *State* v. *Coy*, 2 Aik. 181; *State* v. *Scott*, 24 Vt. 127; *State* v. *Smith*, 43 Vt. 324; 2 Wharton Cr. Law, s. 2338. "A motion to quash is always addressed to the discretion of the court." SHAW, C. J., in *Commonwealth* v. *Hawkins*, 3 Gray, 463. The first and second counts for a conspiracy are good.

State *v.* Stewart.

All the authorities agree that a combination of several persons to accomplish an unlawful or a criminal act by lawful means or to accomplish a lawful act by unlawful or criminal means constitutes an indictable offense.   It is also well settled law, and the rule has been recognized in this State, that it is sufficient to allege an unlawful or criminal combination without any averment of the same being carried into execution.   *Commonmealth* v. *Hunt*, 4 Met. 111 ; *State* v. *Noyes*, 25 Vt. 415.

· Indictments have repeatedly been sustained for conspiracies to procure a woman to leave her father's home and live in fornication or prostitution, although common prostitution was not an indictable offense.   *Rex* v. *Gray*, 1 East P. C. 460 ; *Reg.* v. *Howard*, 4 F. & F. 160 ; *Reg.* v. *Mears*, 4 Cox C. C. 423 ; *Rex* v. *Delaval*, 1 W. Bl. 439.   A fraudulent agreement by a member of a partnership with third persons to obtain wrongfully by false entries upon the partnership books a large portion of the partnership property is an indictable conspiracy at common law.   *Reg.* v. *Warburton*, 11 Cox C. C. 584.   A mock auction with sham bidders in combination to grossly exaggerate prices with intent to defraud is an indictable conspiracy.   *Reg.* v. *Lewis*, 11 Cox C. C. 484.   For directors of a bank, who know it to be insolvent to issue a balance sheet showing profit, declare a dividend, issue advertisements inviting the public to invest upon the faith of their representations with intent to defraud, constitutes an indictable conspiacy. *Reg.* v. *Brown*, 7 Cox C. C. 442.   A conspiracy to carnally know an unmarried female under the form of a pretended marriage is indictable.   *State* v. *Murphy*, 6 Ala. 765.   A conspiracy by justices of the peace to certify that a highway was in repair when they knew it to be otherwise was held indictable.   *Reg.* v. *Mawbey*, 6 Term, 619.   A combination between one member of a partnership and a third person to issue and put in circulation the note of the firm drawn by such partner for the purpose of paying his individual debts, the intention of the combination being fraudulent, is an indicable

State v. Stewart.

conspiracy. *State* v. *Cole*, 39 N. J. L. 324. A conspiracy for the suppression of evidence in a judicial proceeding is indictable. *State* v. *Dewitt*, 2 Hill (S. C.) 282.

It is a conspiracy to cause a marriage falsely to appear of record, and to obtain for that purpose from a justice of the peace a false certificate thereof. *Commonwealth* v. *Waterman*, 122 Mass. 43. See *State* v. *Cardoza*, 11 S. C. 195; Wharton Cr. Law, s. 2322. A conspiracy by journeymen to prevent their employer from taking into his employment any apprentice is indictable. *Rex* v. *Ferguson*, 2 Starkie, N. P. C. 489.

A combination to destroy a man's business and ruin him therein, constitutes an indictable conspiracy. *Rex* v. *Eccles*, 3 Dougl. 337. A combination by journeymen to control wages, fine any workman who violated their rule for wages, and compel a master to discharge any workman who did not comply with the rules of the combination by all leaving the master's employment unless he submitted to their dictation, was held to be indictable. *People* v. *Fisher*, 14 Wend. 9.

To precisely the same effect are *State* v. *Donaldson*, 32 N. J. L. 151; *People* v. *Trequier*, Wheeler's Crim. Cases (N. Y.) 142; *People* v. *Melvin*, 2 Wheeler's Crim. Cases (N. Y.) 262; *Rex* v. *Kimberly*, 1 Lev. 62; *Rex* v. *Sterling*, 1 Lev. 125. A combination of workmen for the purpose of dictating to masters whom they shall employ is indictable. *Rex* v. *Bykerdyke*, 1 M. & Rob. 179; *Rex* v. *Duffield*, 5 Cox C. C. 404. See Arch. Cr. Prac. & Pl. 1830.; *Reg.* v. *Hewitt*, 5 Cox C. C. 162.

In a recent case (*Regina* v. *Bunn*, 12 Cox C. C. 316), an agreement by the servants to quit without notice and in breach of their contracts with intent to impede and destroy the business of their employer is held to be an indictable conspiracy. *See* Wharton Cr. Law, s. 2477; *State* v. *Jackson*, 1 Spear, 13; *Cain* v. *Dyer*, 128 Mass. 70; *Reg.* v. *Rowland*, 17 Q. B. (79 E. C. L.) 671; s. c. 9 L. R. Eq. 287; s. c. 5 Cox C. C.; *Elkins* v. *People*, 28 N. Y. 177; 110 U. S. 651.

The opinion of the court was delivered by

POWERS, J. Although authorities can be found that lay down the rule that felonies and misdemeanors, or different felonies, cannot be joined in the same indictment, still the rule in this and most of the states is otherwise.

It is always and everywhere permissible for the pleader to set forth the offense he seeks to prosecute in all the various ways necessary to meet the possible phases of evidence that may appear at the trial. If the counts cover the same transaction, though involving offenses of different grade, the court has it in its power to preserve all rights of defence intact. *Commonwealth* v. *McLaughlin*, 12 Cush. 612; *State* v. *Lincoln*, 49 N. H. 464; *State* v. *Smalley*, 50 Vt. 736; *State* v. *Thornton*, 56 Vt. 35; *Rex* v. *Ferguson*, 2 Stark. 489. Moreover, the motion to quash is addressed to the discretion of the court, and its refusal is not the subject of revision here. *Commonwealth* v. *Eastman*, 1 Cush. 189; *Commonwealth* v. *Ryan*, 9 Gray, 137; 1 Wharton Cr. Law, s. 519.

The respondents' counsel argues that the first and second counts do not cover the offense of criminal conspiracy at common law. But we think upon a careful examination of the English and American cases cited in argument, and we suspect that none have been overlooked on either side, that it is clear to a demonstration that a combination of the character set forth in these counts was a conspiracy at the common law; and, further, that the subject-matter of the offense being the same in this country as in England; namely, an interference with the property rights of third persons, and a restraint upon the lawful prosecution of their industries as well as an unlawful control over the free use and employment by workmen of their own personal skill and labor, at such times, for such prices, and for such persons as they please, the common law of England is " applicable to our local situation and circumstances " in this behalf, and is therefore the common law of Vermont.

In England and here, it is lawful, and it may be added, commendable, for any body of men to associate themselves

together for the purpose of bettering their condition in any respect, financial or social. The very genius of free institutions invites them to higher levels and better fortunes. They may dictate their own wages, fraternize with their own associates, choose their own employers, and serve man and mammon according to the dictates of their own conscience.

But while the law accords this liberty to one, it accords a like liberty to every other one; and all are bound to so use and enjoy their own liberties and privileges as not to interfere with those of their neighbors.

All the legislation in England and America has been progressively in the direction of according to laborers the enjoyment of equal rights with others.

The early English statutes, beginning with the middle of the fourteenth century, are to be read in the light of the civilization of that day, and their provisions, to us of the nineteenth century, harsh, illiberal and tyrannical, were but the reflex of the prevalent notions of class distinctions, that shaped and guided the social and political polity of those days.

From time to time, however, down to 1875, this legislation has been liberalized and christianized; and to-day in England, as here, workmen stand upon the same broad level of equality before the law with all other vocations, professions, or callings whatsoever, respecting the disposition of their labor and the advancement of their associated interests.

, There, as here, it is unlawful for employers wrongfully to coerce, intimidate or hinder the free choice of workmen in the disposal of their time and talents. There, as here, it is unlawful for workmen wrongfully to coerce, intimidate or hinder employers in the selection of such workmen as they choose to employ. There, as here, no employer can say to a workman he must not work for another employer, nor can a workman say to an employer he cannot employ the service of another workman.

By the law of the land, these respondents have the most unqualified right to work for whom they please, and at such

prices as they please. By the law of the land, O'Rourke and Goodfellow have the same right. By the same law, the Ryegate Granite Company has the right to employ the respondents or O'Rourke on such terms as may be mutually agreed upon, without let, hinderance, or dictation from any man or body of men whatever.

Suppose the members of a Bar Association in Caledonia County should combine and declare that the respondents should employ no attorney, not a member of such association, to assist them in their defence in this case, under the penalty of being dubbed a "scab," and having his name paraded in the public press as unworthy of recognition among his brethren, and himself brought into hatred, envy and contempt, would the respondents look upon this as an innocent intermeddling with their rights under the law? The proposition has only to be stated to disclose its utter inconsistency with every principle of justice that permeates the law under which we live.

If such conspiracies are to be tolerated as innocent, then every farmer in Vermont, now resting in the confidence that he may employ such assistance in carrying on his farm as he thinks he can afford to hire, is exposed to the operation of some secret code of law, in the framing of which he had no voice, and upon the terms of which he has no veto, and every manufacturer is handicapped by a system that portends certain destruction to his industry. If our agricultural and manufacturing industries are sleeping upon the fires of a volcano, liable to eruption at any moment, it is high time our people knew it.

But, happily, such is not the law, and among English-speaking people never has been the law. The reports, English and American, are full of illustrations of the doctrine that a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, whether such purpose be illegal at common law or by statute; or to effect a legal purpose by illegal means, whether such means be illegal at common law or by statute, is a common law conspiracy. Such combina-

tions are equally illegal whether they promote objects or adopt means that are *per se* indictable ; or promote objects or adopt means that are *per se* oppressive, immoral or wrongfully prejudicial to the rights of others.

If they seek to restrain trade, or tend to the destruction of the material prosperity of the country, they work injury to the whole public.

These propositions are the clear deduction of the cases cited in argument, and breathe a spirit of equality and justice that must commend itself to every intelligent mind.

Counsel have cited to us no case in which it has been ruled that this crime of conspiracy does not exist at the common law. We are referred to Mr. Wright's clever monograph upon Criminal Conspiracies, wherein the author, though not denying that conspiracies to injure industries and against the free exercise of one's calling according to his own choice, were held to be criminal at the common law, still attempts to throw doubt upon the basis upon which the doctrine rests.

But when in 1 Hawkins' Pleas of the Crown, c. 27, s. 2 (a book of great authority ; 2 Russell on Crimes, 674), it is laid down "that all *conspiracies whatever*, wrongfully to prejudice a third person, are highly criminal at common law ; " and in 2 Wharton's, Criminal Law, s. 2322, it is said that " a combination is a conspiracy in law whenever the act to be done has a necessary tendency to prejudice the public, or oppreses individuals, by unjustly subjecting them to the power of the confederates, and giving effect to the purposes of the latter, whether of extortion or mischief ; " and the same proposition, in one form of expression and another, is laid down in 2 Bishiop's Criminal Law, s. 172 ; and in Desty's Criminal Law, s. 11 ; and in 3 Chitty's Criminal Law, 1138 ; and in Archbold's Crim. Prac. & Pl. 1830 ; and it was said by DENMAN, Ch. J., in *Queen* v. *Kenrick*, 5 Q. B. 49 : " It was contended, in the first place, that the third count was bad by reason of uncertainty, as giving no notice of the offense charged. The whole law of conspiracy, as it has been administered at least for the

last hundred years, has been thus called in question; for we have sufficient proof that during that period any combination to prejudice another unlawfully has been considered as constituting the offense so called. The offense has been held to consist in the conspiracy, and not in the acts committed for carrying it into effect; and the charge has been held to be sufficiently made in general terms describing an *unlawful conspiracy to effect a bad purpose;*" and Baron ROLFE, in *Reg.* v. *Selsby*, 5 Cox Crim. Cas. 495; and TINDAL, Ch. J., in *Reg.* v. *Harris*, 1 Car. & Marsh. 661; and CROMPTON, J., in *Hilton* v. *Eckersley*, 6 E. & B. 47; and GROVE, J., in *Rex* v. *Mawbey*, 6 T. R. 619; and Lord MANSFIELD, in *Rex* v. *Eccles*, 1 Leach Crown Cas. 274; and HILL, J., in *Walsby* v. *Anley*, 3 E. & E. 516; and CAMPBELL, Ch. J., in *Reg.* v. *Rowlands*, 17 Adolp. & El. 670; and Baron BRAMWELL, in *Reg.* v. *Druitt*, 10 Cox Crim. Cas. 592; and BRETT, J., in *Reg.* v. *Bunn*, 12 Cox Crim. Cas. 316; and MALINS, V. C., in *Springhead Co.* v. *Riley*, L. R. 6 Eq. 551; and COLERIDGE, Ch. J., in *Mogul S. S. Co.* v. *McGregor*, L. R. 15 Q. B. Div. 476; and SHAW, Ch. J., in *Commonwealth* v. *Hunt*, 4 Met. 111, 128; and CATON, Ch. J., in *Smith* v. *The People*, 25 Ill. 17; and GIBSON, Ch. J., in *Commonwealth* v. *Carlisle*, Journal Jurisprudence, 225; and CHAPMAN, Ch. J., in *Carew* v. *Rutherford*, 106 Mass. 1,—have all added their endorsement of the doctrine advanced as early as the work of Hawkins, *supra;* and it is manifest that we are compelled to forsake the literature of *doubt*, and to cleave unto that of *authority.* See also *Rex* v. *Ferguson*, 2 Starkie, N. P. 489; *Rex* v. *Bykerdike*, 1 M. & Rob. 179; *People* v. *Fisher*, 14 Wend. 9; *State* v. *Donaldson*, 3 Vroom, 32 (N. J. L.) 151; *Snow* v. *Wheeler*, 113 Mass. 186; *State* v. *Noyes*, 25 Vt. 415; *State* v. *Burnham*, 15 N. H. 396; *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Penn. St. 173.

Vice-Chancellor MALINS, in the case cited *supra*, states the law of the subject in brief but intelligible words: " Every man is at liberty to enter into a combination to keep up the price of

wages; but if he enters into a combination for the object·of interfering with the perfect freedom of action of another man, it is an offense, not only at common law, but under Act 6, Geo. 4, c. 129."

The principle upon which the cases, English and American, proceed, is, that every man has the right to employ his talents, industry and capital as he pleases, free from the dictation of others; and if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy. The labor and skill of the workman, be it of high or low degree, the plant of the manufacturer, the equipment of the farmer, the investments of commerce, are all in equal sense property. If men by overt acts of violence destroy either, they are guilty of crime. The anathemas of a secret organization of men combined for the purpose of controlling the industry of others by a species of intimidation that works upon the mind rather than the body, are quite as dangerous, and generally altogether more effective, than acts of actual violence. And while such conspiracies may give to the individual directly affected by them a private right of action for damages, they at the same time lay a basis for an indictment on the ground that the State itself is directly concerned in the promotion of all legitimate industries and the development of all its resources, and owes the duty of protection to its citizens engaged in the exercise of their callings. The good order, peace and general prosperity of the State are directly involved in the question.

In the case at bar, the third and fourth counts set forth more particularly the methods adopted by the respondents to interfere with the prosecution of its business by the Ryegate Granite Works. They charge the respondents with an intent to prevent the prosecution of the work of that company by threatening O'Rourke, Goodfellow and others, that the Ryegate Granite Works were "scab shops" and all workmen therein were "scabs," and their names would be published in the "scab" list in the Granite Cutters' Journal, and that they would be shunned and not allowed to work with other granite cutters,

and would be disgraced in the craft, etc. ; by all which O'Rourke, Goodfellow and others were frightened and driven away from said shops.

The exposure of a legitimate business to the control of an association that can order away its employees and frighten away others that it may seek to employ, and thus be compelled to cease the further prosecution of its work, is a condition of things utterly at war with every principle of justice, and with every safeguard of protection that citizens under our system of government are entitled to enjoy. The direct tendency of such intimidation is to establish over labor and over all industries, a control that is unknown to the law, and that is exerted by a secret association of conspirators, that is actuated solely by personal considerations, and whose plans, carried into execution, usually result in violence and the destruction of property.

That evils exist in the relations of capital and labor, and that workmen have grievances that oftentimes call for relief, are facts that observing men cannot deny. With such questions we, as a court, have no function to discharge further than to say that the remedy cannot be found in the boycott.

But it is objected that the first and second counts are defective in form.

In the first count the pleader charges an unlawful combination, conspiracy, confederacy and agreement to prevent, hinder and deter, by violence, threats and intimidation, the Ryegate Granite Works from retaining and taking into its employ O'Rourke, Goodfellow and others.

In the second count, after stating a malicious intent to control, injure, terrify and impoverish the Granite Company, he charges an unlawful conspiracy, combination, confederacy and agreement to *terrify, frighten, alarm, intimidate* and *drive away*, by *threats* and *intimidation*, O'Rourke, etc., who were *then and there* workmen and laborers of the Granite Works.

Both counts charge an unlawful conspiracy ; and both set forth the means by which the conspiracy is to be carried into effect. The unlawful conspiracy is enough without the state-

ment of the means to show an offense at the common law. A conspiracy to hinder, prevent and deter a man from retaining and taking into his employ an attorney to defend his cause is a clear violation of his as well as the attorney's personal rights; and equally so is a combination to terrify, alarm and drive away his attorney already employed. The natural tendency and inevitable consequence of such combinations is to restrain the prosecution of legitimate callings and industries, and thereby injure the public as well as individuals. The coercive intent, emphasized and expanded by the aggregation of numbers, and amounting to a show of force, gives to such combination its character of illegality.

If in fact the respondents *had* prevented, hindered and deterred the Granite Works from employing O'Rourke, the act would confessedly have been criminal. It logically follows that a *conspiracy* to do this thing would be equally so.

It is not necessary to aver that the Granite Works desired or intended to employ O'Rourke. An allegation that it was in fact prevented from employing him *ex vi termini* implies a purpose to employ him which has been met and thwarted. So an allegation that the respondents *conspired* to hinder and prevent such employment imports an intent to interfere with the execution of a purpose already resolved upon. But the pleader has supplemented the charge of unlawful conspiracy by an allegation of the *means* by which it is to be accomplished; namely, by *violence, threats* and *intimidation*. Our statute, ss. 4226, 4227, R. L., has prescribed a punishment for using threats or intimidation to prevent a person from accepting or continuing an employment in a mill, etc.

These counts then charge a conspiracy to do an act unlawful at common law, by means unlawful under the statute.

In such case, it is not necessary to set out specifically the kind of threats or methods of intimidation made use of. The words of the statute may be used without setting forth their meaning. Thus in *Regina* v. *Rowlands*, 17 Adol. & El. N. S. 671, the indictment among other things charged a conspiracy

to force workmen to quit the employment of the Messrs. Perry by using threats and intimidation. The statute, 6 Geo. 4, c. 129, s. 3, forbids the use of such means. The court said : " It is objected that some counts do not disclose the nature of the molestation or intimidation by which the conspiracy was to take effect ; but this is quite unnecessary. The words of the legislature are used ; the terms in question have a meaning stamped upon them by the Act, 6 Geo. 4, c. 129, s. 3, and we must take it that they are used here in that sense. And they are not employed as describing the substantive offense for which the indictment is preferred ; that offense consists in the *conspiracy*, which is a misdemeanor at common law."

In *Commonwealth* v. *Dyer*, 128 Mass. 70, under a statute similar to ours, a like decision was made ; and such is the general rule in criminal pleading, even when the statutory terms create the offense. 1 Wharton, Crim. Law, s. 364 ; *State* v. *Cook*, 38 Vt. 437.

Here the conspiracy is the complete criminal act. It was wholly unnecessary to aver the means by which the conspiracy was to be carried out. *State* v. *Noyes*, 25 Vt. 415, 422. Herein lies the distinction between this case and *Commonwealth* v. *Hunt*, 4 Met. 111, relied upon by the respondents. In that case the substantive offense was a conspiracy, but not to do an unlawful act ; and the means laid for its accomplishment were laid as mere matters of aggravation ; so no crime whatever was charged in the indictment.

If the means to be used are not necessarily unlawful, either by statute or the common law, and are laid as the *corpus delicti*, then the rule contended for by the respondents applies ; and a particular statement of the means to be used must be set out, so that the court can see on the face of the indictment that a crime has been committed. In *State* v. *Keach*, 40 Vt. 113, this court laid down the rule as follows : " The adjudged cases uniformly recognize the rule that a general allegation that two or more persons conspire to effect an object criminal in itself, as to commit a misdemeanor or felony, is sufficient, even though

the indictment omits all charges of the particular means to be used; and the cases are now equally uniform in holding that if the agreement or combination be to do an act or to effect an object not criminal, by the use of unlawful means, a general charge of a conspiracy to effect the object is not sufficient; and the charge of such a conspiracy must be accompanied with a particular statement of the means by which the object of the conspiracy was to be effected, so that those means may appear to be criminal, or the indictment will be bad."

These counts are drawn in accordance with approved precedents,—2 Wharton's Prac. 657, 666; Bishop's Forms, ss. 303, 304,—and are, we think, sufficient without the supplementary averment of the means to be used; and *a fortiori* a count charging a conspiracy to do an *unlawful* act by *unlawful* means must be held sufficient.

Much that has already been said applies to the third and fourth counts.

We think they sufficiently set out an offense under s. 4227, R. L. The language of the statute is adopted, all the elements of the offense clearly enumerated, and the whole charged to have been done with the intent specified. This is sufficient. *Commonwealth* v. *Dyer, supra; Reg.* v. *Rowlands, supra; State* v. *Jones,* 33 Vt. 443; *State* v. *Cook,* 38 Vt. 437; 1 Wharton, Crim. Law, s. 364.

It was unnecessary to aver knowledge in the respondents of the wrongful character of the matters and things charged against them. If an act in its natural characteristics and quality is unlawful, knowledge of its wrongful character is presumed. It is otherwise when it becomes wrongful by the presence of accidental or fortuitous features not ordinarily attendant upon it. Thus in *State* v. *Carpenter,* 54 Vt. 551, cited by respondents, the respondent was presumed to know that it was unlawful to assault Larose as an individual. So for such assault no averment was necessary to bring home to him knowledge of the wrongful quality of his act. But when the same act was enlarged to the grade of an offense for impeding Larose as a

R. R. Co. *v.* Hunt.

public officer, it took on a character so abnormal that knowledge of this artificial quality of his act in the respondent must be alleged in order to lay a basis for a guilty intent.

We do not deem it necessary to extend this discussion—already too long drawn out—in following *seriatim* the numerous objections taken in the able and elaborate brief of the respondents to the different counts of this indictment. The general scope of the views expressed covers the whole ground, we think; and the result is, the judgment of the County Court overruling the motion to quash and overruling the demurrer, and adjudging the indictment to be sufficient, is affirmed; and the cause is remanded, to be further proceeded with.