## Supreme Court—General Term—First Department.

*March,* 1888.

## PEOPLE *ex rel.* GILL *v.* WALSH.*

(Affirming 5 *N. Y. Crim. Rep.* 507.)

BOYCOTTING.—STRIKES.—CONSPIRACY.

Workmen have a right to seek by all peaceable means an increase of wages, and all meetings and combinations having that object in view, which are not distinguished by violence or threats, are lawful.

But a combination by workmen to drive out, and prevent from working in a certain district, an objectionable person, is a criminal conspiracy.

---

* In the present case it will be seen that the points of counsel are reported at some length, as it seemed that the importance of the case and the fact that the General Term delivered but a very brief opinion and the Court of Appeals none at all, would justify giving the arguments of counsel with unusual fullness. This case and succeeding ones, State *v.* Glidden (Conn.), and Crump *v.* Commonwealth (Va.), form together a full discussion, in their varying aspects, of strikes and boycotts.

Appeal by the relator, John E. Gill, from an order made at the Special Term of the Supreme Court of the City and County of New York, September 29, 1887, Hon. GEORGE C. BARRETT, presiding, dismissing writes of habeas corpus and certiorari.

The facts in this case have been already given in the report of the decision at Special Term by Mr. Justice BARRETT, at 5 *N. Y. Crim. Rep.* 507.

In September, 1886, Messrs. Gardner & Estes, shoe manufacturers in New York City, employed the complainant Hartt as a foreman. The relator was an officer of a Shoemakers' Trade Union, known as "District Assembly 91, of the Knights of Labor," and was employed in the manufactory of Messrs. Gardner & Estes. The form of organization of a shoemakers' trade union is as follows: The members working in a single shop, are called the shop's crew, and have the care of their common interests in the shop. Different members of a shop's crew may, and often do, belong to different local assemblies of the Knights of Labor of the shoemaking trade, according to their choice, and the local assemblies in and around New York City send delegates to a central body, being District Assembly No. 91, and having jurisdiction over all shoemakers who are Knights of Labor within a radius of fifty miles of New York. Only shoemakers are members. The avowed object of the association is to keep up wages.

The shoe factory owned by Gardner & Estes was within the territory of District Assembly, No. 91, and was what is called a "union" shop, that is, all the employes were members of the organization.

When the shop's crew learned of tha employment of Hartt as a foreman, and before he entered upon the discharge of his duties, the shop's crew communicated with the firm, objecting to working under him, for the reason that, as they claimed, Hartt had the reputation of what is termed in the dialect of the trades union "an old-time scab,"

who would try to reduce wages; " that he was was a scab and disorganizer and always trying to cut down wages," and they were afraid he would endeavor to break up the organization in this shop, which could be done by discharging one union man at a time and employing non-union men until the shop became independent of the organization.

The " scab " is a term applied by Knights of Labor and trades unionists to a person who works for less wages than those fixed by the assembly, or " union," or who continues at his employment after a strike has been declared.

At the request of the firm, the shop's crew agreed to lay the matter over for a month, " to see whether Hartt would attempt to undermine the organization." At the end of that time, nothing having occurred to excite the suspicion of the crew, they postponed consideration of the subject for two months longer. Before the expiration of that period, Hartt discharged a member of the organization named Potter, for having swindled the firm by altering checks and coupons and thereby securing payment for labor which he had not performed. The crew demanded Potter's reinstatement, and upon their demands, Potter was reinstated pending the return of Mr. Gardner from the South.

When Mr. Gardner returned some weeks later, having investigated the circumstances, he directed Potter to be discharged by Hartt, whereupon a lockout, or strike (the testimony upon this point is somewhat conflicting) occurred and the firm's business was stopped for six or seven weeks.

The relator and his co-defendants, constituting an executive committee of District Assembly 91 of the Knights of Labor, then called upon the firm and demanded the discharge, not only of Hartt, but of two other foremen, and, also, that Potter be reinstated.

This demand the firm refused to comply with at first, and from time to time as the strike or lockout continued, conferences were held between the Knights of Labor, represented by defendants as executive committee of District Assembly No. 91, and representatives of the boot and shoe

manufacturers, and at these meetings the union committee refused to listen to any proposition which did not exclude the possibility of Hartt's return to Gardner & Estes's employment. At various times the committee and its different members were asked whether, in case of the final discharge of Hartt from the firm's employment, they would in any way endeavor to prevent his obtaining a situation in some other shoe manufactory, and while at times they were silent as to their intention in this respect, at others they declared that Hartt should not thereafter obtain any employment within the jurisdiction of District Assembly No. 91.

On or about the 21st day of February, 1887, Gardner & Lestes were compelled to accede to the demands of the strikers represented by the defendants, and informed Hartt that they could not hold out any longer, and that he must resign or be discharged.

The relator testified that he had been engaged as a journeyman shoemaker for about eight years; that he was a member of District Assembly No. 91, of the Knights of Labor and treasurer of that organization, a member of the executive, and also of the arbitration committee, which met at the Cosmopolitan Hotel in September to form rules for the trade and for arbitration between the manufacturers and the employes, and that he was secretary of the executive committee at the time of the strike.

The higher body in the order is the General Assembly of the United States and Canada, formed of delegates elected from the district assemblies throughout the country. Next in order come the district assemblies, composed of delegates from the various local assemblies in what is called "districts." The local assemblies are composed of workmen in the trades who voluntarily join. The shop's crew bore the same relation to the local assembly as the latter to the district assembly.

The shop's crew have absolute control over certain matters in the shop in trade affairs. If grievances exist, the officers of the shop are supposed to investigate it and if they

cannot settle it, the matter goes to the local assembly at the request of the shop's crew. The matter is then acted upon by the local assembly, and from there it may be carried to the district, and, finally, to the general assembly. District Assembly 91 has a territorial jurisdiction extending over a radius of fifty miles from the center of New York City. Its membership is formed by delegates from the local assemblies in that territory, composed entirely of shoemakers belonging to the Knights of Labor, and the delegates number about 120. It discusses trade matters and sends out orders which are decided upon by the evidence taken among its members. It also orders strikes. The local assemblies are obliged under the customs and rules of the order to obey the directions and orders of the district assembly. If the district assembly orders a strike, the local assemblies are obliged to act in accordance with the order. Strikes are sometimes ordered by delegates without any vote of the local assembly. When a strike is ordered by the district assembly and the local assembly is notified, if the minority fails to go out, this would be sufficient ground for expulsion from the organization.

The difficulty in Gardner & Estes' shop was first called to the attention of the arbitration committee by the shop's crew in December or January. In response to their call, the committee went to see Mr. Gardner for the purpose of trying to settle it. The shop's crew had requested that the matter be looked into to see if something could not be done to have it arbitrated thoroughly. They declared then they would not work with Hartt, and wanted Mr. Potter reinstated. The answer to the question, "Did they instruct you as consenting to an arbitration that involved his (Hartt's) coming back?" Relator answered, "They said they would not work under him."

After investigating the complaint, the arbitration committee, composed of the relator and his co-defendants, called upon Mr. Gardner and asked him the reason for locking the men out, informing him that the shop was declared on a

strike by the district assembly, and also that they the shop's crew, would not work under Mr. Hartt or the two other foremen whom they mentioned; and wanted Mr. Potter reinstated. Mr. Gardner was informed that the shop would not go to work until this was done. He was asked why the shop was locked out, and replied, "the committee knew as well as he did," that is, for discharging Potter.

Demands were made for the prosecution of Potter, but during the interview Mr. Gardner gave the relator a letter stating that he would not prosecute Potter pending an investigation. After this interview, the committee informed Mr. Gardner that they would keep Potter in readiness for arrest for twelve hours, but no action was taken, for reasons partly explained by Mr. Gardner. After this, the committee told Potter he could go.

The compromise by which the defendants allowed all the men to remain in Gardner & Estes' employment except Hartt was brought about by reason of the shop's crew coming to the conclusion that the two other foremen whose discharge in addition to that of Hartt had been demanded, in the language of the relator, " did not have any control over them to any extent, and that Mr. Hartt had supervision over the whole business, and after tending a meeting of the manufacturers' committee, we went back to the shop's crew and said we were willing to put the words ' held for a certain limit' of time in the agreement. They said we could do what we pleased, but they would not go to work until the word 'discharged' was put in there. After this we went back and told the manufacturers' committee what they said and after some delay this was agreed to."

*Louis F. Post*, for the relator.

I. A conspiracy to prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, or intimidation, is not proved.

1. Force, threats, or intimidation.—There are three essential elements to this form of conspiracy, viz: *a.* A con-

federation; *b.* A purpose to prevent another from doing a lawful act; *c.* The use to that end of force, threats, or intimidation.

Concede the first two elements, and yet the third is wholly lacking.

That *force* was used or was to be used is not pretended. At worst there was nothing but a refusal of men who belonged to a trade organization to work with men who did not. *Abb. Law Dic.* "Force;" State *v.* Blake, 39 *Me.* 322; Evill *v.* Conwell, 2 *Blackf.* 133; 18 *Am. Dec.* 138 *n.,* and cases cited in note.

That *threats* of force or violence were used or were to be used is not pretended. And rules of statutory construction require that the term "threats" in this statute, associated as it is with the term "force," should be held to mean threats of force. Violence was the dominating idea in the legislative mind. Even on the assumption that any kind of threat (whether of force or not) is within the statute, the words alleged to be threats in this case were not threats. A threat is a menace used to compel the doing or not doing of some act. *Abb. Law Dic.* "Threats." Neither the relator nor his associates were trying to coerce Hartt in any way. They said nothing to Hart or in his presence. What they did was to state to a third party, in reply to inquiries, that Hart could not work within the jurisdiction of their organization; namely, in "union shops."

That any *intimidation* was used or was to be used is not shown.

On the question of force, threat, and intimidation, see two cases in England, and one in Pennsylvania.

In Walsby *v.* Anley, 3 *E. & E.* 516, it appeared that the defendant brought to the complainant a paper signed by the defendant and about thirty other workmen, of which the following is a copy: "At a meeting of the joiners in the employ of Mr. Anley [the complainant], Tuesday evening, May 15, 1860, it was resolved that Mr. Anley be given to understand that unless the men who are working under the declara-

tion in his shop be discharged, and we have a definite answer by dinner-time to that effect, we cease work immediately." The complainant refusing to comply, all the signers of the paper struck work. The statute (6 Geo. 4, c. 129, § 3) made it a crime "by threats or intimidation or by molesting or in any way obstructing another," to "force or endeavor to force any person" engaged in carrying on any trade or business to limit the number or description of his workmen. The defendants were convicted and on appeal the conviction was sustained. COCKBURN, Ch. J., said: "Although I at first entertained some slight doubt whether what was said amounted to a threat, I have no doubt whatever that the conduct of the appellant and the other malcontent workmen amounted to a 'molesting' of the master." CROMPTON, J., was for conviction, because the conduct fell within the prohibition of the statute "against endeavoring by threats or intimidation" to force an employer, etc. HILL, J., was of opinion, that the conduct amounted to a threat; but his reason for it was that the combination threatened was in itself illegal at common law.

It will be noticed in this case that the fact that common law conspiracy was still recognized in England (as it cannot be in New York), and that the statute forbade the particular object aimed at by the confederacy, was controlling.

A second English case is more closely analogous to the case at bar. It is Wood *v.* Bowron, 2 *L. R. Q. B.* 21, arising under the same statute, and decided six years later. Here the defendants, officers of a trade union, ordered complainant's workmen to strike, and they did so; being asked by the complainant for their reason for ordering a strike, the officers [the defendants] replied that it was in consequence of a resolution of the union to the effect that "no society bricklayer will work for Thomas Bowron [the complainant] until such times as he parts with some of his apprentices." The defendants were acquitted on appeal.

COCKBURN, Ch. J., said: "In order to sustain the conviction it is necessary that there should be a threat or intimida-

tion, with the object of compelling the master to alter the conduct of his business or to limit the number of apprentices he may employ. . . . We must see whether the letter written under the circumstances I have adverted to amounts to a threat. I think that it does not."

SHEE, J., said: . . . "There being, however, nothing of any kind to show it was intended to communicate the resolution to the respondent, it seems to me the fact that it was not communicated to him at the time takes it clearly out of denomination of a threat; for there cannot be a threat to any one unless it be intimated to him. A threat must be an intimation made with the intention of forcing or unduly influencing the conduct of the person to whom it is addressed. . . . Was the communication of this resolution on October 28 a threat? I think not. A threat must be an intimation given by a person of his own accord, and within this statute it must be made with an intent to coerce or to endeavor to force the future conduct of the person to whom it is addressed."

LUSH, J., said : " It is the very essence of a threat that it should be made for the purpose of intimidating or overcoming the will of the person to whom it is addressed.

The Pennsylvania case, Commonwealth *ex rel.* Vallette *v.* Sheriff, 15 *Phila.* 393, was decided under the following circumstances: In Pennsylvania it is lawful by statute (Act of 1872) for workingmen in combination to refuse to work whenever it would be contrary to the rules of their association; but they are prohibited from hindering persons who desire to work from so doing. By a supplement (Act of 1876) it was declared that the use of lawful and peaceful means, having for their object a lawful purpose, should not be regarded as in any way hindering, and that the use of force, threat, or menace should alone be regarded. Under these acts it was held that when a committee from a trade union visits a place where members of the union are working and requires them to quit work, such notice is not a

hindering, by means of force, threat, or menace, and the defendants were discharged on *habeas corpus.*

The principle to be drawn from these cases is that a threat, to come within the meaning of the statute, must be threat to do an unlawful act; and, in the State of New York, where common-law conspiracy is no longer known, a threat of workmen to refuse, singly or collectively, to work in the same shop with another, is not a threat to do an illegal act.

2. *The right to choose shop associates.* Taking the testimony of the prosecution, still it is clear that there was no suggestion of force or unlawful coercion, and that what was intended and understood was that the members of this organization either would not work with Hartt, or could not work with him and retain their membership. Is there any law against this?

Cannot one man lawfully refuse to work with another? Cannot two men agree not to work with another? Cannot three so agree? And if one of the three break his compact can he not be lawfully deprived of any advantages under the compact? And if this would be lawful as to three, would it not be lawful as to three thousand?

"We cannot perceive," says Ch. J. SHAW, in Commonwealth *v.* Hunt (4 *Metc.* 130), "that it is criminal for men to agree together to exercise their own acknowledged rights in such a manner as best to subserve their own interests. One way to test this is to consider the effect of such an agreement where the object of the association is acknowledged to be a laudable one. Suppose a class of workmen, impressed with the manifold evils of intemperance, should agree with each other not to work in a shop in which ardent spirits was furnished, or not to work in a shop with any one who used it, or not to work for an employer who should, after notice, employ a journeyman who habitually used it. The consequences might be the same. A workman who should still persist in the use of ardent spirits would find it more difficult to get employment; a master employing such an one might ofttimes experience inconvenience in his work

in losing the services of a skillful but intemperate workman. Still it seems to us that, as the object would be lawful, and the means not unlawful, such an agreement could not be pronounced a criminal conspiracy."

And CHAPMAN, Ch. J., in Carew *v.* Rutherford, 106 *Mass.* 14, says: "It is no crime for any number of persons, without an unlawful object in view, to associate themselves together and agree that that they will not work for, or deal with certain men or classes of men, or work under a certain price, or without certain conditions."

II. A conspiracy to commit an act injurious to trade or commerce is not proved.

Such a conspiracy must affect trade or commerce generally (at least as to a locality), and not merely the trade or commerce of one man or shop. People *v.* Fisher, 14 *Wend.* 1.

The statute relates to matters of public, not of private, concern. It makes it a crime to conspire "to commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws." See King *v.* De Berenger, 3 *M. & S.* 67; King *v.* Norris, 2 *Ld. Kenyon*, 300.

Conspiring to prevent a man from working, or a shop from employing a certain man, is not a conspiracy to injure trade or commerce. True, the shoemakers' conspiracy in People *v.* Fisher, 14 *Wend.* 9, was held to be injurious to trade, but only because it tended to injuriously affect the the trade of a town—trade generally. No such factor appears in this case.

Conspiracy to injure an individual in his trade, or to commit a civil injury of any description which is not in itself an indictable offense, never was a crime. State *v.* Rickey, 4 *Halst.* 293; King *v.* Turner, 13 *East*, 228.

In State *v.* Donaldson, 3 *Vroom* (*N. J.*), 151, it was charged that the defendant's journeymen workmen conspired to strike against their employers unless and until the employers should dismiss two workmen. In delivering

judgment on motion to quash the indictment, BEASLEY, Ch. J., said : " On the argument before this court, counsel in behalf of the State endeavored to sustain the indictability of this charge on the plea that the thing thus agreed to be done was an injury to trade and consequently came within the express language of the statute on the subject of conspiracy. But I cannot concur in this view.   An act to fall within this provision must be one which with directness inflicts an injury on trade, as for example, a combination to depress any branch of trade by false rumors.   But, in the case before us, the act charged, if it could be said to injure trade at all, did so, not proximately, but remotely.   It is true that at a far remove an injury to an individual manufacturer may affect trade injuriously, but in the same sense, so it is true, will an injury inflicted on a consumer of manufactured articles.   But it is not this undesigned and incidental damage which is embraced within the statutory denunciation.   On this account I think the indictment does not present an affair which can be comprehended by the clause of the act which in this respect was relied on.   But, as it has already been decided by this court that the statute in question has not superseded the common law with regard to the crime of conspiracy, the question still remains to be resolved whether the facts charged on this record do not constitute such crime upon general principles."

And as to the latter point, namely, that the facts made out a common-law conspiracy, the motion to quash was not allowed to prevail.   But, inasmuch as common law conspiracy, as such, is abolished in this State, and our courts are confined to the statute, the New Jersey case is not a precedent for the people in the case at bar, and the opinion of Chief Justice BEASLEY is an important citation in behalf of the relator.

III.  Labor strikes are not unlawful.

Even upon the assumption that the defendant was party to a labor strike, his acts do not constitute a crime.

1. *Strikes not common-law conspiracies.*   That labor

strikes were never conspiracies at common law is well settled. The dicta of Chief Justice SAVAGE, in People *v.* Fisher, 14 *Wend.* 1, and the decisions in the Journeymen Cordwainers' case, *Yates Sel. Ca.*, and People *v.* Trequier, 1 *Wheel.* 142, to the effect that labor strikes are common-law conspiracies, are attributable to an erroneous supposition that certain English cases condemning strikes were declarations of the common law, whereas they grew out of the Statutes of Laborers, which were never accepted as part of the common law of this country. Commonwealth *v.* Hunt, 4 *Metc.* 111; Stevedores *v.* Walsh, 2 *Daly*, 1; Bowen *v.* Matthewson, 14 *Allen*, 499; Historical Review by COLERIDGE, J., in Lumley *v.* Gage, 2 *El. & Bl.* 244, 253; Argument of Sampson and Colden, in Journeymen Cordwainers' Case, *Yates Sel. Ca.* 116-195; Argument of Rantoul in Commonwealth *v.* Hunt, *supra.*

2. *Strikes at one time regarded as statutory conspiracies to injure trade.* The only basis in this State for the prosecution of peaceable strikes is the statute prohibiting conspiracies to injure trade or commerce. It was upon this statute that Chief Justice SAVAGE founded his decision in the Fisher case. People *v.* Fisher, 14 *Wend.* 1; Commonwealth *v.* Hunt, *supra.*

3. *Strikes injure trade by affecting wages.* In what way does a strike injure trade or commerce? Obviously, by tending to raise wages. If not in that way, then, though it may injure this man or that man, for which the injured party may have redress civilly, it does not injure trade or commerce.

The theory is that as the cornering of merchandise injures trade and commerce by arbitrarily enhancing the price of merchandise, so the cornering of labor injures trade and commerce by arbitrarily enhancing the price of labor. This was Judge SAVAGE's idea in the Fisher case. He gave no reason for bringing strikes within the provisions of our conspiracy statute which did not proceed from the theory that they injure trade and commerce by arbitrarily increasing

wages. People *v.* Fisher, 14 *Wend.* 1. Judge SAVAGE said : "In the present case an industrious man was driven out of employment by the unlawful measures pursued by the defendants. . . . In so far as the individual sustains an injury, the remedy by indictment is taken away by our revised statutes, and the sufferer is left to his action on the case." But it was also a conspiracy to enhance the wages of Geneva shoemakers, and upon that ground, and that ground alone, Judge SAVAGE held it to be a conspiracy to injure the trade of Geneva. That this was the sole reason for the decision is evident, not alone from the fact that no other reason was given or could be given, but also from the drift of his argument.

4. *Only wages strikes ever indictable in this State.* There is neither reason nor authority for holding that peaceable strikes were ever indictable in this State unless they were intended to affect wages. See citations, *supra.*

5. *Wages strikes legalized.* That it is the tendency of strikes to affect wages is not questioned ; nor need it be disputed that they are on that account injurious to trade within the meaning of the statute prohibiting conspiracies to injure trade or commerce ; but so far as it thus applies to strikes, that statute is repealed.

The Penal Code declares that " The orderly and peaceable assembling or co-operation of persons employed in any calling, trade, or handicraft for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, in not a conspiracy." *Penal Code,* § 170.

6. *Therefore, all peaceable strikes are lawful.* Since peaceable strikes, except as they injure trade by tending to raise wages, never were indictable conspiracies in this State, this statute (*Penal Code,* § 170) has the effect of legalizing all peaceable strikes. Its obvious purpose, in view of previous adjudications, was not to limit strikes to questions of wages, but to permit peaceable strikes, as well on account of wages as for other purposes.

Hence the learned justice below was in error in holding

that the judgment in the Geneva case is not affected by the statute, when ", there is no relation, direct or indirect, between wages and strike." As that judgment did not condemn strikes other than wages strikes, the effect of the statute legalizing wages strikes was to wholly nullify the judgment as a declaration of the law.

7. *Recapitulation.* 1. Peaceable strikes are not common-law conspiracies; 2. They were at one time, in this State, statutory conspiracies to injure trade; 3. But they injured trade only by arbitrarily increasing wages; 4. Therefore, none but wages strikes, if peaceable, were ever indictable in this State; 5. But peaceable wages strikes are legalized; 6. Therefore, all peaceable strikes are now lawful in this State.

IV. Construction of sections 168 and 170 of Penal Code.

The relator is within the protection of section 170 of the Penal Code.

That section is not limited to striks that relate directly to wages; it also authorizes, by implication, any peaceable and orderly strike, the ultimate object of which is to raise or maintain wages.

The statute (§ 170) provides that "the orderly and peaceable assembling or coöperation of persons employed in any calling, trade or handicraft, for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, is not a conspiracy."

Section 170 modifies every clause of section 168 to the extent of permitting all that section 168 forbids, provided it be done peaceably by workmen to raise or maintain the rate of wages; and, since section 170 is remedial while section 168 is penal, it is immaterial whether the raising or maintaining of wages be the immediate or ultimate object of the coöperation. Therefore, if the conduct of relator or his associates would not have been unlawful if the strike had immediately involved a question of wages, it was not unlawful in the circumstances of the case as presented by the evidence.

*John R. Fellows,* district attorney (*John D. Lindsay,* deputy-assistant), for the people.

I. The facts established before the committing magistrate constituted a conspiracy to do an act injurious to trade within the meaning of subd. 6 of section 168.

Section 168 of the Penal Code provides that " If two or more persons conspire . . . 5. To prevent another from exercising a lawful trade or calling . . . by force, threats intimidation.

" 6. To commit any act injurious . . . to trade or commerce . . . each of them is guilty of a misdemeanor."

The word " injurious " is defined by Webster as follows :

" Wrongful; unjust; hurtful to the rights of another. That which impairs rights or prevents the enjoyment of them, is injurious. . . . 3. Affecting with damage or loss. Indolence is injurious to property. 4. Mischievous, hurtful. . . . 7. In general . . . whatever impairs or destroys property or rights, . . . whatever retards prosperity or defeats the success of a good cause, is deemed injurious."

The same authority defines " trade " as " The act or business of exchanging commodities by barter ; commerce, traffic, barter. Trade comprehends every species of exchange or dealing, either in the produce of land, in manufactures, in bills, or money. It is, however, chiefly used to denote the barter or purchase and sale of goods, wares and merchandise, either by wholesale or retail. Trade is either foreign, or domestic, or inland." See People *v.* Fisher, 14 *Wend.* 1.

The objects of the combination were not limited in application to any one firm, but were intended to operate throughout the entire trade. Obviously, whatever restrains trade must be injurious to it. The following cases have held certain combinations to be in restraint of trade and therefore illegal.

In an English case decided in 1856, many manufacturers, in consequence of troubles between themselves and their employes, entered into an agreement and gave a bond

that they would abide by the rates of labor, hours of work,. and other regulations which a majority of those who entered into the combination should decide upon. The court held that the compact was in restraint of trade—that it was illegal and void, and that the bond could not be enforced. Hilton *v.* Echersley, 6 *El. & Bl.* 47.

This case is clearly in point, and has a very forcible bearing upon the case at bar. If to voluntarily agree to abide by regulations and rules mutually adopted, affecting the conduct of business is illegal, as tending to restrain and injure trade, an agreement and confederacy to compel a submission to arbitrary rules established by the members of an outside combination must certainly have a more injurious tendency.

In Ohio, some ten yeays ago, many salt manufacturers formed a " Trust," by agreeing to sell all their product to an unincorporated joint stock association. The latter was composed of and its directors were elected by the manufacturers. The purpose of the combination was to have the association buy the salt from the manufacturers and sell it to the public, and thereby prevent competition. The court held the combination to be illegal (Central Ohio Salt Co. *v.* Guthrie, 35 *Ohio St.* 666, 1880), the court saying: " Public policy . . . . is opposed to monopolies which tend to advance market prices to the injury of the general public. The clear tendency of such an agreement is to establish a monopoly and to destroy competition in trade . . . . It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public."

About the year 1870 five Pennsylvania coal corporations, which together controlled a certain kind of coal, combined and agreed that sales should be made through a committee and a general agent, and that thereby prices should be fixed,

freights made and sales and deliveries adjusted. If any company sold more than a fixed proportion, it was to pay a certain amount to the others. The combination was held to be illegal, and a conspiracy under the New York statute against the commission of any act by two or more persons injurious . . . to trade or commerce." Morris Run Coal Co. *v.* Barclay Coal Co., 68 *Pa. St.* 173 (1871).

In this State, in 1869, a coal company bought coal from several corporations upon their contract not to sell to any other parties in that locality. The Court of Appeals held that the contract was illegal and an unlawful combination. Arnot *v.* Pittston, &c. Coal Co., 68 *N. Y.* 558. See also Clancy *v.* Onondaga, &c. Co., 62 *Barb.* 395.

In Illinois, about the year 1875, all the grain dealers in a town secretly combined and made contracts by which they controlled the price of grain and the local storehouse accommodations. The parties succeeded, but disagreed in their division of the profits. An action for an accounting was brought by one against another. The court refused to aid either party, saying: " The four firms, by a deep-laid secret combination, attempted to control and monopolize the entire grain trade of the town and surrounding country. That the effect of this contract was to restrain the trade and commerce of the country is a proposition that cannot be successfully denied." Craft *v.* McConoughy, 79 *Ill.* 346.

In this State the proprietors of five lines of boats engaged in canal transportation agreed to combine and do business at certain rates for freight and passage. The net earnings were to be divided among themselves in a fixed proportion. One of the parties sued another to compel him to make payment. The court (in 1847) held that the combination was void under the statutes of New York, and said: " It is a familiar maxim that ' competition is the life of trade.' It follows that whatever destroys or even relaxes competition in trade is injurious, if not fatal, to it." Hooker *v.* Vandewater, 4 *Den.* 349. See also Stanton *v.* Allen, 5 *Id.* 434.

And indeed, ever since the days of Lord Coke, who, in

the great and leading "Case of the Monopolies" (11 *Coke*, 84), declared that a monopoly was illegal and void, there has been a continuous line of cases which have protected trade and the public against any and all schemes and devices of competitors to unite and regulate prices.

The position of the law is clear. Combinations to restrict production, or to prevent competition, or to regulate prices, and all conspiracies to attain these ends, or whose effects will be to cause these results, are illegal.

It will be noticed that the Massachusetts court, in the case of Commonwealth *v.* Hunt, 4 *Metc.* 111, did not consider the question as to whether the acts charged in the indictment constituted a conspiracy to do an act injurious to trade. The court, in referring to the Fisher case (People *v.* Fisher, 14 *Wend.* 1), say that the combination in that case was held to be "a violation of the statutes making it criminal to commit any act injurious to trade or commerce. It has, therefore, an indirect application only to the present case," *i.e.*, for the reason that it was not contended by the prosecution that such a conspiracy was criminal under the Massachusetts law, the theory upon which the indictment was drawn being for a combination detrimental to individuals, and not to the public at large, and the court goes so far upon this theory as to say : " Suppose a farmer employing a large number of men engaged for the year at fair monthly wages, and suppose that just at the moment that his crops were ready to harvest they should all combine to quit his service, unless he would advance their wages, at a time when other laborers could not be obtained ; it would surely be a conspiracy to do an unlawful act, though of such a character that, if done by an individual, it would lay the foundation of a civil action only."

And yet such a combination would not affect trade or commerce in general, and its result would be injurious to but one individual. The court puts the case upon the ground that it would be a combination to violate a contract, and as such criminal.

In this State such a combination would not constitute a crime unless it tended to injuriously affect trade. For these reasons we submit the Massachusetts decision has no bearing upon the questions involved in the case at bar.

The doctrine declared by Chief Justice SHAW, and also by Chief Justice CHAPMAN, in Carew *v.* Rutherford (106 *Mass.* 14), that it is not criminal for men " to agree together to exercise their own acknowledged rights in such a manner as best to subserve their own interests," is undoubtedly the law. But the test as to the criminality of associations of this character given in Commonwealth *v.* Hunt (*supra*), is in our opinion the best argument we could offer in support of our contention that the effect is to be considered.

There is a vast distinction between that case and this. There the object of the suppositious agreement was acknowledged to be a laudable one,—*i.e.*, a determination, as much as might be, to avoid and lessen the "manifold evils of intemperance." Here its effect is oppression to subserve private demands, coercion and compulsion, resulting in great loss to a business concern, impoverishment and ruin to a workman.

II. The combination herein established is not within the protection of section 170.

By chapter 19 of the Laws of 1870, entitled " An Act in relation to employers and persons employed, and to amend subdivision 6 of section 8 of title 6, chapter 1, part 4 of the Revised Statutes," it was enacted that the provisions of the Revised Statutes defining conspiracy should " not be construed in any court of this State to restrict or prohibit the orderly and peaceable assembling or co-operation of persons employed in any profession, trade, or handicraft, for the purpose of securing an advance in the rate of wages or compensation or for the maintenance of such rate."

This statute conferred no new rights upon the workman, as we shall show. It provided merely that the conspiracy laws should not be construed to impair certain rights. These rights were the common-law property of the workingman.

In February, 1879, a special committee of the Senate, appointed pursuant to a resolution passed in May, 1878, to sit during the recess and examine and review the bills submitted at the last session of the Legislature to revise the statutes, and report the result, presented a proposed bill entitled "An Act relating to crimes and the punishment thereof." The bill was intended (as the commission say) to form "The Criminal Code." The report proceeds: "It does not, however, purport to be a complete code of criminal law, nor is it intended to abrogate the common law relating to crimes. . . . We have retained, and report herewith, the notes accompanying the bill, as reported by the revisers, with such modifications as are necessary to adapt them to the changes which we have made in the text. These notes explain the sections reported, and point out in detail the changes which they make in the existing law."

By section 132 of the bill so reported the present conspiracy statute was presented, and section 133 provided that "no conspiracy is punishable criminally unless it is one of those enumerated in the last section, and the orderly and peaceable assembling or co-operation of persons employed in any calling, trade, or handicraft for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate is not a conspiracy, provided none of the acts or things prohibited thereby is done or agreed to be done by the persons assembling or co-operating." In other words, the combination to effect the end permitted was lawful, unless in pursuance thereof the members of the combination resorted to means denounced by the former section; and that this was the commissioners' view of the then existing law is evident from the fact that these two sections are reported without any notes. The act so reported was not passed, and the enactment of 1870 continued in force until the Penal Code went into effect on December 1, 1882.

By the Penal Code, section 168, the provisions of the Revised Statutes defining the crime of conspiracy were re-enacted *in hæc verba,* and the amendment of 1879 was

embodied in section 170, by which it is declared that no conspiracy except as provided in section 168 is criminal, "and the orderly and peaceable assembly or co-operation of persons employed in any calling, trade, or handicraft, for the purpose of obtaining an advance in the rate of wages or compensation, or of maintaining such rate, is not conspiracy."

The raising of wages was never an act injurious to trade. It was only the coercive or oppressive means used to obtain that end which injured trade,—the interference and dictation of outsiders with and in the affairs of others preventing the carrying on of business in a natural, untrammeled, and unobstructed course, without foreign or baneful interference.

At common law a combination became unlawful whenever its tendency was to defraud, injure, oppress the public or any large class of persons. And, therefore, the courts in passing upon the criminality or illegality of combinations looked not to whether the successful consummation of the agreement would particularly injure trade, but whether it would in any manner operate to the detriment of the public.

A conspiracy to do an act injurious to trade first became as such criminal in this State by the enactment of the statute now embodied in section 168 of the Penal Code. Before the passage of the act, however, conspiracies to injure trade were none the less unlawful. People *v.* Melvin, 2 *Wheel.* 262; People *v.* Trequier, 1 *Id.* 143; Master Stevedores' Association *v.* Walsh, 2 *Daly*, 1, and cases therein cited.

All conspiracies to do acts injurious to trade were indictable at common law because they operated to the injury of the public.

The case of People *v.* Melvin, 2 *Wheel.* 262 (Journeymen Cordwainers' case) is particularly in point, for the reason that the criminality of the combination therein established was upheld as being an act injuriously affecting the public in general, and particularly injurious to master cordwainers and workmen not members of the association whose members constituted the combination, and the rights of

workingmen to combine for an increase of wages was fully recognized.

The case in one aspect is on all fours with the one at bar—a combination for a purpose in no way directly related to the obtaining of a rate of wages or maintaining such rate, to the injury of trade, and all outsiders or non-sympathizers who might be affected by it. All the rights of co-operation that have been accorded by section 170 of the Penal Code were allowed by the court in this case.

The facts in that case bear a great similarity to many of the circumstances attending the case at bar. For the prosecution it was admitted, as in the present case, that there had been no personal violence, no outrage or disorder, but it was submitted whether the coercive measures of the society were less cruel or oppressive for that reason.

In People *v.* Fisher, 14 *Wend.* 1, the Supreme Court did substantially declare a combination to raise wages a conspiracy under the New York statute. That question was not before the court, however. The point to be determined was whether the offense as charged in the indictment was indictable under the revised statutes, and although the court, in passing upon its sufficiently, laid down a rule which we believe was founded upon a mistaken supposition as to the common-law rights of workmen to combine for an increase of wages, the main question determined is in accordance with all the cases decided in this State, both prior and subsequent to this decision.

The question involved was simply whether the acts as charged constituted a crime. The acts charged did not allege a combination to raise wages, but to do certain things which, upon the theory of the prosecution, tended, if consummated, to the injury of trade. It was this combination which the court declared unlawful; and most manifestly was it so, and so it would be at the present time. So far, therefore, as this decision holds a combination to raise wages in itself a criminal conspiracy, the views of the court are merely *obiter dicta*.

See the criticism in Master Stevedores' Association *v.* Walsh, 2 *Daly*, 1, Chief Justice DALY in a most carefully prepared and learned opinion of the Fisher case.

He thus states the rights of the laborer and of the employer:

" Every man has the right to fix the price of his own labor, to work for whom he pleases, and for any sum he thinks proper, and every master-workman has the right to determine for himself whom he will employ, and what wages he will pay. Any attempt by force, threat, intimidation, or other coercive means, to control a man in the fair and lawful exercise of these rights, is therefore an act of oppression, and any combination for such a purpose is a. conspiracy."

" It may therefore be laid down as the result of this examination, that it is lawful for any number of journeymen, or of master-workmen, to agree on the one part that they will not work below certain rates, or on the other that they will not pay above certain prices ; but that any association or combination for the purpose of compelling journeymen or employers to conform to any rule, regulation or agreement fixing the rate of wages, to which they are not parties, by the imposition of penalties, by agreeing to quit the service of any employer who employs a journeyman below certain rates, unless the journeyman pays the penalty imposed by the combination, or by menaces, threats or intimidations, violence, or other unlawful means, is a conspiracy for which the parties entering into it may be indicted."

It should be borne in mind that Chief Justice DALY's decision was rendered before the act of 1870.

In the case of the Philadelphia Journeymen Tailors, printed at Philadelphia, 1827, Recorder REED, upon a full examination of the subject, and after reviewing the opinion of his predecessor, Recorder LEVY, held that an agreement among journeymen not to work unless they received certain wages, where it did not extend beyond themselves, and where no other means were used, was not illegal, though it

.would be if the object was to operate upon others not vol-untarily entering into the agreement. Journeymen, he said, have an undoubted right, by an agreement among them-selves, to regulate their own conduct, to ask as much as they please for their services; but the moment they under-take to interfere with the rights of others, or enter into combinations for such a purpose, the act is criminal, and they become conspirators.

In Commonwealth v. Hunt, 4 *Metc.* 111, which we have already considered in another aspect, the broad proposition was laid down that men are free to work for whom they please, or not to work if they so prefer; and that it is not criminal for them to agree together to exercise this right in such a manner as may best subserve their own interest: and in the case of the Hartford Carpet Weavers, tried before the Superior Court in Connecticut, in 1836, printed at Hartford, 1836, Chief Justice WILLIAMS told the jury that if the real nature of the agreement between the defendants was an agreement not to work below certain prices, that it was not an indictable offense nor the subject of a civil ac-tion.

We think it well established, therefore, that all the rights declared by section 170 belonged to the laborer at common law. These common-law rights of the working-man are plain, and no further rights are thereby conferred.

We will now consider what acts may lawfully be done by the laborer and what acts he may not lawfully do in the exercise and protection of these rights.

" ONE MUST SO USE HIS OWN RIGHTS AS NOT TO INFRINGE UPON THE RIGHTS OF ANOTHER." The labor union, the com-bination to raise or maintain wages, has its rights, as we have seen, but so has every workingman, every citizen, be he a member of a trade union or not.

Applying the familiar maxim above quoted to the ques-tion involved herein, the orderly and peaceable assembling and co-operation intended by section 170, is that which does

not infringe upon the rights of others, which works no un-just injury to persons not members of the combination—which results not in oppression. Matter of Jacobs, 2 *N. Y. Crim. Rep.* 340; affirmed 4 *Id.* 539; Live Stock Associa-tion *v.* Crescent City Co., 1 *Abb. U. S.* 388; The Slaughter House Case, dissenting opinion by BRADLEY, J., 16 *Wall.* 36; State *v.* Stewart, 59 *Vt.* 273.

The law does not obtain for workingmen an advance in the rate of wages, nor maintain such rate for them. Nor does it give them the right so to do. It cannot by any means be construed as intending that they shall have an ad-vance or maintain a rate.

The argument of the learned counsel for the relator, that its object is to secure this, is based upon a wrong idea of the purpose and effect of the statute.

By the act of 5 Geo. IV. c. 95, all the prior English labor statutes were repealed and in their stead this statute, which was prepared with great care, was enacted. It prohibits all persons from attempting by threats, intimidation or violence, to force any workman to quit his employment or to prevent him from hiring himself to, or accepting work from any person, or for the purpose of compelling him to join any club or association, or to contribute to any common fund, or to pay any fine or penalty for not doing so, or for refusing to comply with any regulations made to obtain an advance, or to reduce the rate of wages, or to lessen the hours of labor, or the quantity of work; but the act, at the same time, declares that it shall be lawful for any persons to meet together, for the sole purpose of consulting upon or deter-mining the rate of wages, which the persons so assembling shall require or demand, or the hours or time they will work in their respective employments, and that they may enter into any agreements, verbal or written, among themselves, for the purpose of fixing the rate of wages which the parties so agreeing may demand, and that the persons so uniting

and agreeing shall not be liable to any prosecution or penalty for so doing.

This statute was construed in Rex *v.* Bykerdike, 1 *Moody & Rob.* 179, decided at the Lancaster Spring Assizes, 1832. The defendants were indicted for that they "did conspire," etc., "unlawfully to intimidate, prejudice and oppress one John Garforth in his trade and occupation, agent for a certain colliery," etc., "and to prevent the workmen of the said J. G. from continuing to work in the said colliery." The second count laid a conspiracy to oppress and injure Joseph Jonas and others, partners in a certain colliery, etc., and to prevent the workmen in their employ from continuing to work at said colliery, and to compel them to discharge the said workmen in their employ. For the defense it was argued that as to the earlier part of the indictment the workmen were clearly justified in combining among themselves not to work since the act above cited. The prosecution contended that the statute did not protect a combination for such a purpose as this, but only for obtaining higher wages, regulating time, etc. PATTERSON, J., told the jury that the statute never meant to empower workmen to meet and combine for the purpose of dictating to the master whom he should employ; and that this compulsion was clearly illegal.

Section 170, in our opinion, is intended to give the labor unions every fair and reasonable means to better the interests of their members; to afford them opportunity of associating and working together toward the laudable and beneficial end of, by all fair methods, obtaining reasonable and proper wages for honest and competent labor. But further than this the law does not go.

We confidently submit that the object and the means of the conspirators herein are not within the protection of section 170.

III. The facts as presented to the committing magistrate established a conspiracy to prevent Obder M. Hartt

from exercising his lawful trade and calling by force, threats or intimidation.

BRADY, J.—The examination given in the record demonstrates the propriety of the order made from which the appeal was taken. No doubt exists of the right of the workmen to seek, by all peaceable means, an increase of wages, and all meetings and combinations having that object in view, which are not distinguished by violence or threats, and are lawful therefore, cannot be reasonably condemned or justly interfered with. And so all combinations and meetings designed to prevent an increase of wages, which are not characterized by violence or threats, by resort to unlawful means or accessories, are lawful, and cannot be justly condemned or interfered with. Employer and employe stand upon the same plane precisely in this respect, and neither, legally, has the advantage of the other. It follows that when either is engaged in a persecution of the other, simply because of the exercise of this right, he is within the pale of just condemnation, and especially when resort is made to menace, threat, violence or other unlawful pretense. Here the proof shows that the complainant is designated by workmen as a "scab," "disorganizer," and chiefly because he essays, as they aver, to reduce wages. Assuming that to be so, it should not invoke the disasters of a strike, which puts his employer, for the time being, at the mercy of the workmen, who are often hastily led away, not only to their great detriment but that of the employer, and sometimes the public at large. But if this must be done to perfect an organization, or to hold it together firmly, it should end there, and not resolve itself into what the law condemns, namely, a determination that the objectionable person, the "scab," so-called, shall be driven away and prevented from working, even for the support of his family, within a district large or small. This is a conspiracy pronounced, and justly so, to be criminal, and is punishable by imprisonment. The testimony given on the complaint of

Hartt, herein made, as Justice BARRETT has stated, a *prima facie* case in this respect against the appellant, and when that is done it becomes the duty of the magistrate conducting the proceeding to commit the offender. These observations may not be necessary in contemplation of the opinion of Justice BARRETT, which amply covers the whole case and which is adopted as a clear and concise exposition of the law governing such offenses as here charged. The subject, however, is attractive, and one upon which much may be said, as well for master as for workmen, whose interests are mutual, though different in pecuniary results, because of the difference between capital and labor. It should be the object of the workman to further the interests of his employer with a view to his own advantage and advancement, and of the employer to foster and cherish his workmen, who contribute to the successful use of his capital or the prosperous continuance of his business. It may be difficult to reconcile these relations to suit the numerous demands of the different classes of laborers, but that affords no justification for violence, which amounts to banishment. The vilest criminal, when at large, has the right to labor if he can procure the employment, and in that respect he is entitled to the fullest protection. Indeed, it is in this way only that he can be reformed, and not by ostracism, which drives him to dishonesty. This is preventive of the exercise of a lawful calling, which the statute denounces.

The order appealed from should be affirmed, with $10 costs and disbursements.

VAN BRUNT, P.J., concurs; DANIELS, J., concurs in the result.

NOTE.—See State *v.* Glidden, p. 321, and note to Crump. *v.* Commonwealth, *infra*, as to strikes and boycotts.

In a recent and important case (State *v.* Stewart, 59 *Vt.* 273), the Supreme Court of Vermont, in relation to the general subject of boycotts, says :

"The principle upon which the cases, English and American, proceed, is that every man has the right to employ his talents, industry, and capital as he pleases, free from the dictation of others ; and if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy. The labor and skill of the workman, be it of high or low degree,—the plant of the manufacturer, the equipment of the farmer, the investments of commerce,—are all in equal sense property. If men, by overt acts of violence, destroy either, they are guilty of crime. The anathemas of a secret organization of men combined for the purpose of controlling the industry of others by a species of intimidation that works upon the mind rather than the body, are quite as dangerous, and generally altogether more effective than acts of actual violence. And while such conspiracies may give to the individual directly affected by them a private right of action for damages, they at the same time lay a basis for an indictment on the ground that the State itself is directly concerned in the promotion of all legitimate industries, and the development of all its resources ; and owes the duty of protection to its citizens engaged in the exercise of their callings. The good order, peace, and general prosperity of the State is directly involved in the question."

The principal case has been affirmed by the Court of Appeals, June 19, 1888, but without any written opinion,—a fact which is much to be regretted in view of the importance of the case.